# In the United States Court of Federal Claims

No. 11-420
(Originally Filed: August 19, 2011)
(Reissued: September 13, 2011)[1]

* * * * * * * * * * * * * * * * * * * *

MED TRENDS, INC.,

            Plaintiff,

v.

THE UNITED STATES,

            Defendant,

and

MICROTECHNOLOGIES, LLC,

            Intervenor.

Bid Protest; Task Order Contract; Federal Acquisition Streamlining Act; Jurisdiction; Sunset of 41 U.S.C. § 4106(f); Government Cost Estimate; Best Value Analysis

* * * * * * * * * * * * * * * * * * * *

*Cyrus E. Phillips, IV*, Arlington, VA, for plaintiff.

*Nicholas Jabbour*, United States Department of Justice, Civil Division, Washington, D.C., with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Brian M. Simkin*, Assistant Director for defendant. *Herman J. Narcho*, United States Department of Labor, of counsel.

*Katherine S. Nucci*, Washington, D.C., for intervenor.

_____

OPINION

_____

BRUGGINK, *Judge*.

---

[1]In accordance with the protective order in this case, publication was deferred pending the parties' review for redaction of controlled materials. Those redactions are indicated by brackets.

This is a post-award protest of a solicitation for information technology services. Plaintiff, MED Trends, LLC ("MED Trends") challenges the award by the Department of Labor ("DOL") of a task order pursuant to an indefinite quantity/indefinite delivery contract. The awardee, MicroTechnologies, LLC ("MicroTech"), intervened in the action. Currently before the court are the parties' cross-motions for judgment on the Administrative Record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). Also pending are defendant's and intervenor's motions to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6). The motions are fully briefed, and we heard oral argument on August 12, 2011. For the reasons explained below, we deny defendant's and intervenor's motions to dismiss; we deny plaintiff's motion for judgment on the administrative record; and we grant defendant's and intervenor's cross-motions for judgment on the Administrative Record.

FACTUAL BACKGROUND[2]

MED Trends challenges a procurement made pursuant to the Veterans Technology Services Government-Wide Acquisition Contract ("VETS GWAC"). The VETS GWAC is a government-wide contract between the General Services Administration ("GSA") and a pool of pre-qualified contractors, all of which are small businesses owned by service-disabled veterans.[3] Pursuant to the VETS GWAC, and within its guidelines, these contractors are eligible to compete for information technology task orders from various federal agencies.

DOL, acting through the Occupational Safety and Health Administration ("OSHA"), issued Request for Quotations No. RFQ547327 ("RFQ") on February 23, 2011, seeking quotations for maintenance and operation of its Integrated Management Information System. The award would be made on a "best value" basis with consideration given to three factors: technical capability, past performance, and price. Administrative Record ("AR") 140. The three factors were not of equal importance. Rather, technical capability was significantly more important than past performance, which was significantly more important than price. Further, when combined,

---

[2] The facts are drawn from the Administrative Record.

[3] A detailed review of the history and nature of the VETS GWAC is set out in *Knowledge Connections, Inc. v. United States*, 76 Fed. Cl. 6, 8-11 (2007).

the non-price factors were "significantly more important than Factor III 'Price.'" AR 141.  The RFQ further provided that "as offerors' ratings for the non-price factors approach equality, Factor III 'Price' becomes significantly more important in the award decision."  AR 141.  The agency warned that "the Government will not make an award at a significantly higher overall price to achieve slightly superior technical features."  AR 141.

Task orders placed under the VETS GWAC are based on a firm fixed-price pursuant to Subpart 16.2 of the Federal Acquisition Regulation ("FAR"). An offeror's bid, based on its estimate of cost and risk, is fixed and not subject to adjustment on the basis of the actual cost incurred while performing the contract.  Here, the RFQ stated that the Contracting Officer would evaluate offerors' proposed prices pursuant to FAR 15.404-1(b)(2)[4].  The price analysis could rely on a number of metrics when evaluating the reasonableness and realism of an offeror's price, including comparing it to an independent government cost estimate ("IGCE").  Here, the task order contemplated a one-year base period with four successive one-year options.  The estimated total cost of the contract was [      ].  The estimate was based on a calculation "using historical data from previous similar contracts."  AR 596.  It included and was based in part on a prediction of the number of full-time equivalent workers for particular labor categories for each year of the contract.

Three offerors, MED Trends, [      ], and MicroTech submitted bids by the April 1, 2011 deadline.  The technical proposals were evaluated by three DOL representatives who prepared an Evaluation Consensus Form for each of the technical proposals.

The RFQ provided for and defined adjectival ratings for the two non-price factors.  "Factor I, Technical Capability," was broken into four sub-factors:  "Understanding of the Requirement," "Key Personnel Experience," "Corporate Experience," and "Start-Up Plan Phase-Out Plan."  The possible ratings for each sub-factor were "Excellent," "Good," "Marginal," and "Unsatisfactory."[5]

---

[4] The FAR is contained in title 48 of the Code of Federal Regulations, all citations to "FAR" refer to 48 C.F.R.

[5] The solicitation defined the ratings as:

MED Trends, [        ], and MicroTech received the following ratings for the Factor I:

|  | MED Trends | [        ] | MicroTech |
|---|---|---|---|
| Understanding of the Requirement | Good | Marginal | Excellent |

---

| Excellent | A proposal that satisfies all of the Government's requirements with extensive detail to indicate feasibility of the approach and shows a thorough understanding of the problems and offers numerous significant strengths, which are not offset by weaknesses, with an overall low degree of risk in meeting the requirements. |
|---|---|
| Good | A proposal that satisfies all of the Government's requirements with adequate detail to indicate feasability of the approach and shows an understanding of the problems and offers some significant strengths or numerous minor strengths, which are not offset by weaknesses, with an overall low to moderate degree of risk in meeting the requirements. |
| Marginal | A proposal that satisfies all of the Government's requirements with minimum detail to indicate feasibility of approach and shows a minimal understanding of the problem with an overall high degree of risk in meeting the Government's requirement. |
| Unsatisfactory | A proposal that contains a major error(s), omission(s), or deficiency(ies) that indicates a lack of understanding or the problems or an approach that cannot be expected to meet requirements or involves a very high risk and none of these conditions can be corrected without a major rewrite or revision of the proposal. |

AR 95.  The adjectival ratings for past performance were "Low Risk," "Moderate Risk," "High Risk," and "Unknown Risk."  AR 142.

| Key Personnel | Good | Good | Good |
|---|---|---|---|
| Corporate Experience | Marginal | Marginal | Excellent |
| Start-up/Phase-out Plans | Excellent | Marginal | Excellent |

AR 600.

The RFQ provided that, "[t]o receive consideration for award, a rating of no less than 'Good' must be achieved for Factor I, and its associated sub-factors . . . ." AR 141. Despite the fact that MED Trends received a "Marginal" rating for "Corporate Experience," the subsequent de-briefing letter to MED Trends reflected an "Overall Technical Rating–Good." AR 635.

For the past performance factor, MicroTech received a "Low Risk" rating, and MED Trends received a "Moderate Risk" rating. AR 588, 591. Plaintiff does not challenge its past performance rating.

MED Trends' total offered price was $16,868,386.30, which was [        ] than the IGCE. [        ] total price was [        ], which was [        ] than the IGCE. MicroTech's total price was $39,886,717.88, which was [        ] than the IGCE. The agency conducted a price analysis of the three competing bids.[6] It found MicroTech's price to be in line with "the level and scope of work required." AR 596. Based on the disparity between the IGCE and MED Trends' and [        ] total prices, however, the price analysis concluded that "it is possible that both vendors underestimated the depth of work required," and that accepting "[        ] or MED Trends' price proposal would expose the Government to a high level of risk." AR 596.

On June 8, 2011, the agency issued a two-page Award Decision Memorandum. The memorandum reviewed the results of the technical, past performance, and price evaluations for all three offerors and concluded that, "[b]ased on the above, the Contracting Officer has determined that it is in the best interest of the Government" to make the award to MicroTech. AR 601.

Accordingly, on June 10, 2011, DOL entered into the task order contract with MicroTech. On the same day, DOL notified MED Trends by

---

[6] The analysis was conducted by the Contracting Officer and a Contract Specialist.

letter that it had not been awarded the contract because its proposal did not "represent the best value to the government." AR 632. The agency also provided a post-award debriefing report to MED Trends. In the report, DOL noted that the price proposal was "assessed for reasonableness, realism, and affordability." AR 634. The report compared MicroTech's and MED Trends' respective ratings and price proposals. For weaknesses under the "Understanding of the Requirement" sub-factor, the report stated "[h]elp desk [level of effort] appeared to be underestimated and training should be more robust to reach up to 16,000 users." AR 635. For the Key Personnel sub-factor, the report stated that "[s]ome of the key personnel had 1 year or less at OIS, but were not key on the OIS project." AR 635. For the "Corporate Experience" sub-factor, the report stated "[s]hort 1 page summary of corporate experience dominated by check box matrices that were not very informative." AR 636. For the past performance factor, the report stated that MED Trends was a moderate risk; and finally, for the price factor, the report stated that MED Trends' "price proposal underestimated the depth of work required. Accepting [MED Trends'] price proposal . . . would expose the Government to a high level of risk." AR 636.

On June 24, 2011, MED Trends filed its complaint with this court protesting the award to MicroTech.

## DISCUSSION

Currently before the court are defendant's and intervenor's motions to dismiss as well as the parties' cross-motion for judgment on the Administrative Record. When considering the motions to dismiss, we examine the pleadings and supporting documents to determine whether, as a matter of law, jurisdiction is lacking or the claimant has failed to state a claim upon which relief can be granted. Assuming we find jurisdiction and proceed to consider the merits of the protest, we treat plaintiff's motions for judgment on the Administrative Record as the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). Questions of fact are resolved by reference to the administrative record. *Id.*

Our standard of review is the same as that found in the Administrative Procedures Act. 28 U.S.C. § 1491(b)(4) (2006) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Thus, we may hold unlawful and set aside any agency action found to be "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006). Should plaintiff prevail, we "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2) (2006).

I.    Jurisdiction

A. Defendant's Motion to Dismiss Based on 41 U.S.C. § 4106(f)

There is no question that, had this protest been brought one month earlier, the court would not have been able to exercise jurisdiction. Under the Federal Acquisition Streamlining Act of 1994 ("FASA"), as amended, protests of FASA task orders (other than those challenging an increase in scope) could be brought only before the Government Accountability Office ("GAO"), and then only if the amount in controversy exceeded $10,000,000. 41 U.S.C. § 4106(f) (West Supp. 2011). Section 4106(f) contains the following sunset provision, however: "This subsection shall be in effect for three years, beginning on the date that is 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2008." Plaintiff contends that, because the time prescribed in subsection (f) expired on May 27, 2011, the jurisdictional bar to court review of such protests has been eliminated. In the absence of subsection (f), there is nothing that prevents this court from exercising its general bid protest jurisdiction under 28 U.S.C. § 1491(b)(1).

The government disagrees. It concedes that a literal reading of the sunset provision means that all of section 4106(f) is vacated. It points to legislative history that it believes conclusively demonstrates that Congress intended the repeal to apply only to that portion of section 4106(f) that granted jurisdiction to the GAO over any protest of a FASA task order award greater than $10,000,000.

The jurisdictional bar at issue first arose as part of FASA, a "comprehensive overhaul of the federal acquisition laws," S. Rep. No. 103-258, at 3 (1994), intended to "simplify and streamline" the often burdensome requirements for competitive acquisitions. *Digital Tech, Inc. v. United States*, 89 Fed. Cl. 711, 719 (2009); *see Navarro Research & Eng., Inc. v. United States*, 94 Fed. Cl. 224, 227-28 (2010). As part of this simplification, FASA encouraged federal agencies to use "multiple task order contracts, in lieu of single task order contracts" when possible. *Digital Tech*, 89 Fed. Cl. at 719.

Multiple task order contracts allow an agency to use an initial competitive process to select a contractor or pool of eligible contractors, secure contract terms, and make subsequent orders within that smaller group of contractors.

As originally written, FASA generally barred any protest concerning the issuance or proposed issuance of a task order. The only exception to this rule was "on the ground that the order increased the scope, period, or maximum value of the contract under which the order is issued." 41 U.S.C. § 253j(d) (2006) (re-codified at 41 U.S.C. § 4106(f) by Pub. L. No. 111-350, 124 Stat. 3677 (2011)). In 2008, under the National Defense Authorization Act ("NDAA"), Congress added another limited exception to FASA's general bid protest preclusion: task orders valued over $10 million could be protested at GAO. National Defense Authorization Act of 2008, Pub. L. No. 110-181, § 843, 122 Stat. 3, 236-37 (2008). Also at that time, a three-year sunset clause was inserted. *Id.* The current version of the jurisdictional statute reads as follows:

> (f) Protests.—
>
> (1) Protest not authorized.—A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for—
>
> > (A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or
> >
> > (B) a protest of an order valued in excess of $10,000,000.
>
> (2) Jurisdiction over protests.—Notwithstanding section 3556 of title 31, the Comptroller General shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).
>
> (3) Effective period.—This subsection shall be in effect for three years, beginning on the date that is 120 days after January 28, 2008.

41 U.S.C. § 4106(f) (West Supp. 2011).

The question posed by the motion to dismiss is whether section 4106(f)(3) applies to the whole of subsection (f) or only to paragraph (f)(1)(B).

8

The government argues that, notwithstanding the clear language of the statute, the legislative history associated with the 2008 amendment makes clear that the grant of jurisdiction to GAO in 2008 was a short-term experiment. The sunset provision, it contends, was intended to affect only that experiment and not the whole of section 4106.

The government points to two sources to support its interpretation of the legislative history: the conference report regarding the NDAA and draft legislation that is pending before Congress. With respect to the conference report, the government relies on the statement: "The provision would raise the threshold for bid protests to $10.0 million and sunset the authorization for bid protests after three years. The conferees expect that the sunset date will provide Congress with an opportunity to review the implementation of the provision and make any necessary adjustments." H.R. Rep. No. 110-477, at 956 (2007) (Conf. Rep.). With respect to the pending legislation, the government relies on Senate Bill 498 and House Bill 899, both of which make clear that the sunset date, which would be extended, applies only to the specific grant of jurisdiction to GAO: "Paragraph (3) of section 4106(f) of title 41, United States Code, is amended to read as follows: '(3) EFFECTIVE PERIOD.—Paragraph (1)(B) and paragraph (2) of this subsection shall not be in effect after September 30, 2016.'" H.R. 899, 112th Cong. § 1 (2011); *see also* S. 498 112th Cong. § 2 (2011). The language in the committee report accompanying Senate Bill 498 explains that the purpose of the original sunset provision was to "allow Congress the opportunity to assess the impact of the [high-value] protests on [the] Federal procurement system before deciding whether to extend, or let expire, the authority." S. Rep. No. 112-16, at 3 (2011).

The proposed legislation demonstrates two things. First, the perceived need for it suggests that Congress understands that the existing sunset provision does not accomplish the same result. Second, the proposals demonstrate that Congress can legislate with precision when it chooses to do so. Both observations reinforce our reluctance to follow the government's invitation to tell Congress what we think it really intended in 2008.

The legislature "says in a statute what it means and means in a statute what it says there." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992)). For that reason, "our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *Id.*; *see also United States v. Gonzales*, 520 U.S. 1, 9 (1997) ("[T]he straightforward language of [the statute] leaves no

room to speculate about congressional intent."). In this case, the term "subsection" used in section 4106 has a commonly understood and unambiguous meaning: a division of a section. 17 *Oxford English Dictionary* 56 (2d ed. 1989). Therefore, when section 4106(f)(3) refers to "this subsection," it can mean only one thing: the division of section 4106 labeled as (f).

While the government suggests that the meaning of even straightforward statutes can be subject to modification upon resort to legislative history, we read that practice as available only when a straight-forward reading leads to an absurd result. *See, e.g.*, *Crooks v. Harrelson*, 282 U.S. 55, 59-60 (1930). Here, a default to the court's general jurisdiction over bid protests under 28 U.S.C. § 1491(b)(1) would not be an absurd result.

B. Intervenor's Motion to Dismiss Based on Lack of Standing

Intervenor correctly points out that standing is a jurisdictional requirement. *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). Standing for a bid protestor, in turn, depends on an ability to demonstrate prejudice from the asserted violation. *See, e.g.*, *Digitalis Educ. Solutions v. United States*, 97 Fed. Cl. 89, 93-94 (2011). Typically, this requires that the bidder was in a position to receive the award but for the error. *See id.* Here, intervenor argues that plaintiff could not have been awarded the task order because it received a "Marginal" rating on technical sub-factor 3, "Corporate Experience," and, according to the intervenor, the RFQ required at least a "Good" rating on all sub-factors to be eligible for award. The RFQ stated: "To receive consideration for award, a rating of no less than 'Good' must be achieved for Factor I, and its associated sub-factors." AR 94. One plausible reading of this language is that any rating lower than "Good" on any sub-factor would be fatal to a proposal. We decline to apply it in that fashion, however, because the agency itself did not do so. It evaluated both MED Trends and [        ] as if they remained eligible for award, despite the fact that both had "Marginal" ratings on one or more sub-factors. Both were included in the agency's best-value analysis. Therefore, even assuming, *arguendo*, that the agency could have restricted competition to those offerors without "Marginal" ratings on sub-factors, by not doing so, it  waived the right to interpret the provision differently.

II.     Merits

At oral argument, plaintiff announced that it was limiting the grounds for protest to two assertions: that the agency's price analysis and best-value tradeoff analysis were both arbitrary and capricious.  It becomes apparent that the assertions present a common issue, namely, whether the agency's reliance on its IGCE was flawed.

A.  The Price Analysis Did Not Violate the FAR and Was Not Arbitrary or Capricious

Plaintiff argues that the price analysis was "wholly implausible" and violated the FAR.  *See* Pl's. Br. 36.[7]  Specifically, plaintiff argues that the IGCE was a flawed basis of comparison because FAR 15.404-1(b)(2)(ii) dictates that any price comparison based on previous contracts be adjusted for material differences between the terms of the acquisitions.  The plaintiff argues that the IGCE was inherently flawed because it was based on historical contract pricing data different than that which would be relevant to the RFQ.  It points to nothing in the Administrative Record to support that assertion, however.

FAR 15.404-1(b)(2) provides that the "Government may use various price analysis techniques and procedures to ensure a fair and reasonable price. Examples of such techniques include, but are not limited to, the following . . . ."  The FAR then proceeds to list seven examples of appropriate price comparison models, which are not exhaustive.  *See* FAR 15.404-1(b)(2)(i)-(vii).  Example two provides for a "comparison of the proposed prices to historical prices paid . . . ."  Example two also has two sub-paragraphs, which as plaintiff notes, require adjustments of the prior price for material differences between the contracts.  *See* FAR 15.404-1(b)(2)(ii)(A) & (B).  It is example two only, however, to which these sub-paragraphs apply.  Example five is "Comparison of proposed prices with independent Government cost estimates."  FAR 15.404-1(b)(2)(v).  There are no additional requirements provided under example five.  Under the FAR, therefore, the government is allowed to use a government-prepared cost estimate.

---

[7]  Unless otherwise indicated, references to "Pl's. Br." refers to Plaintiff's Brief in Support of Motion for Judgment on the Administrative Record.

The IGCE was broken down into cost areas, labor categories, labor rates, and full-time equivalency hours. DOL prepared the IGCE "using historical data from previous similar contracts." AR 596. The plaintiff has not demonstrated, or even alleged, that any of these particular figures were unreasonable or inaccurate. Nor has it pointed to any authority for the proposition that the agency must provide a more detailed explanation of how its IGCE was formulated. We have held that agencies are "given broad latitude in establishing methods to evaluate price proposals." *Biospherics, Inc. v. United States*, 48 Fed. Cl. 1, 11 (2000). The FAR expressly provides that an IGCE is an appropriate pricing method, and there is nothing in the record to indicate that the IGCE used here was unreasonable. The agency could therefore use it as a basis for evaluating proposals.

B.  The Best-Value Tradeoff Did Not Violate the FAR and Was Not Arbitrary or Capricious

Plaintiff also attacks the best-value tradeoff analysis as "wholly implausible" and in violation of the FAR 16.505(b)(1)(5)(i). Pl's. Br. 41. It contends that the agency failed to articulate any "tradeoffs between non-price factors . . . and Price . . . ." Pl's. Br. 41. In other words, plaintiff contends that the best-value tradeoff was based solely on price quotations and the IGCE. Plaintiff also argues that the best-value tradeoff is erroneous because the Contracting Officer did not "analyze, as was promised in the published Answer to Question Number 88, the quality of the VETS GWAC Contractors' estimates of the Level of Effort which will be required to now deploy the redesigned OSHA OI and to operate and maintain OSHA OIS . . . ." Pl's. Br. 41. Both of these arguments fail.

The FAR provides that:

The contracting officer shall document in the contract file the rationale for placement and price of each order, including the basis for award and the rationale for any tradeoffs among cost or price and non-cost considerations in making the award decision. *This documentation need not quantify the tradeoffs that led to the decision*."

FAR 16.505(b)(5)(i) (emphasis added). In the Award Decision Memorandum, the Contracting Officer listed the technical ratings for all three offerors. Of the four sub-factors to "Technical Approach," MicroTech received three "Excellent" ratings and one "Good" rating. Whereas, MED Trends received two "Good" ratings, a "Marginal" rating, and only one "Excellent" rating. As the RFQ noted, "[t]he Government is more concerned with obtaining superior

technical features than with making an award at the lowest overall price to the government." AR 141. Moreover, the Contracting Officer noted that MicroTech was rated higher for the second factor, past performance. As the RFQ provided, "non-Price factors [i.e., technical approach and past performance] combined are significantly more important than [price]." AR 140.

After setting forth the ratings for technical approach, past performance, and price, the Contracting Officer concluded that MicroTech offered the best value to the government. While the decision could have benefitted from more detail, we are entitled to infer that the Contracting Officer was fully aware of the significant differences in technical and past performance ratings, and that, in light of the RFQ's weighting of those factors, she concluded that award to MicroTech was warranted. *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1355-56 (Fed. Cir. 2004) ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value."). In other words, based on its superior ratings, and despite the significant difference in price, there was a rational basis to award the contract to MicroTech.[8] *See CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). We believe that a remand merely to confirm that inference would be pointless.

Plaintiff's second challenge to the best-value tradeoff is that Question and Answer 88 in the RFQ provided that some form of special analysis would take place.[9] We find, however, that Question and Answer 88 does not promise

_____

[8] The RFQ specifically cautioned that "the Government will not make an award at a significantly higher overall price to achieve slightly superior technical features." AR 141. While MicroTech's proposal was significantly higher in price, it was also more than "slightly superior" in terms of technical capability.

[9] Question and Answer 88 stated:

88. Does the government have high-level of effort estimates for development work? Are strategic requirements defined? If not, on what basis would the government like us to estimate level of effort for development work?

Answer: Vendors are expected to estimate the level of effort based on their experience with similar projects and expertise in the IT field. It is up to the vendors to review the

that any special analysis will take place.  Therefore, there is nothing in the record to demonstrate that the Contracting Officer's decision was arbitrary, capricious, or otherwise not in accordance with the law.

CONCLUSION

For the reasons stated above, we deny defendant's and intervenor's motions to dismiss, deny plaintiff's motion for judgment on the Administrative Record, and grant defendant's and intervenor's motions for judgment on the Administrative Record.  The Clerk is directed to enter judgment accordingly. No costs.

<u>s/ Eric G. Bruggink</u>
Eric G. Bruggink
Judge

_____

SOW and propose what they estimate the level of effort would be for their company to performance [sic] the services.
AR 195.